THE LAW FIRM OF

# CÉSAR DE CASTRO, P.C.
ATTORNEY AT LAW

The District
111 Fulton Street - 602
New York, New York 10038
631.460.3951 Office
646.285.2077 Mobile
646.839.2682 Facsimile
cdecastro@cdecastrolaw.com
cdecastrolaw.com

September 8, 2025

*Via* ECF

The Honorable Carol Bagley Amon
United States District Court Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Leury Mojica*, 25 Cr. 13 (CBA)

Dear Judge Amon,

In February 2022 Mr. Mojica was arrested, charged with Hobbs Act Robbery, and detained at the Metropolitan Detention Center ("MDC") in Brooklyn, New York. *See United States v. Mojica,* 21 Cr. 377 (AKH) (S.D.N.Y.) (the "S.D.N.Y. Matter"). Mr. Mojica was accused of being a fairly low-level participant in the charged offense, had never been to jail before, and had certainly never served any significant jail time. While housed at the MDC, some of his co-defendants and fellow inmates reached out to his family to report that Mr. Mojica's mental health had deteriorated and they believed he was experiencing a mental health breakdown. They reported that he was hearing voices, talking to himself, and acting out in strange ways at the jail. Mr. Mojica accepted responsibility and pled guilty. He was facing an advisory Guidelines range of 51 – 63 months' imprisonment. Despite his extreme mental health struggles, his counsel at the time did nothing to have him evaluated and present mitigating mental health evidence to the sentencing court. Prior to sentencing, Mr. Mojica participated in an assault on a fellow inmate. The government moved to enhance his sentence based on that conduct. His counsel again failed to evaluate Mr. Mojica's mental health or present any mitigating mental health evidence to the sentencing court. Instead he submitted a two-page sentencing submission that did not adequately describe any mitigating factors in Mr. Mojica's life. With respect to the government's request to enhance Mr. Mojica's sentence based on the inmate assault, Mr. Mojica's prior counsel submitted a six-page supplemental submission in which it did not, again, adequately describe any mitigating factors in Mr. Mojica's life. At sentencing, the court considered the sentencing factors under 18 U.S.C. § 3553(a) as well as his involvement in an attack on another inmate and upwardly varied nineteen months above the low end of the advisory Guidelines range and sentenced Mr. Mojica to almost six years' imprisonment.

Having little to no mental health care, Mr. Mojica's mental health continued to deteriorate and, ultimately, he assaulted a guard – the crime for which he stands before the Court for this sentencing. Here, as a condition of the government's plea offer, Mr. Mojica again accepted responsibility and faces sentencing exposure for his participation in the attack on a fellow inmate for which his Southern District sentence was enhanced.

He is now before this Court, after his mental health has finally been evaluated, to be sentenced for a one punch assault on a correction's officer and facing an artificially enhanced advisory Guidelines range based on the inmate assault for which his Southern District's sentence was already enhanced. Mr. Mojica's life has been tragic. Tragic because he never received adequate mental health treatment outside prison and then when inside prison and spiraling out of control without adequate mental health treatment, he committed crimes that have multiplied his sentencing exposure. However, this Court can and should recognize that Mr. Mojica has already been additionally punished for the MDC inmate assault (the "Stipulated Conduct") and only sentence him for the crime to which he pled guilty and has not been punished, assaulting a correction's officer. Accordingly, we request that you sentence Mr. Mojica to a sentence within the advisory Guidelines range absent the enhancements for participating in the inmate assault. The Court should sentence Mr. Mojica to 12 months' imprisonment. That sentence appropriately factors: (1) the time he has spent housed at the MDC (and USP Canaan) under punitive conditions; (2) his history and characteristics; and (3) that he has already been punished for the Stipulated Conduct.

I. **The Pre-Sentence Investigative Report and the United States Sentencing Guidelines Advisory Range**

On April 17, 2025, Mr. Mojica pled guilty, pursuant to a plea agreement, to assaulting a federal officer in violation of 18 U.S.C. § 111. In the plea agreement, Mr. Mojica stipulated to his participation in an assault on a fellow inmate in violation of 18 U.S.C. § 113(a)(1) (the "Stipulated Conduct"). As reflected in the plea agreement, this Stipulated Conduct ultimately drives Mr. Mojica's offense level to an artificially high 34 points after a reduction for acceptance of responsibility. With a Criminal History Category of II, this results in an advisory Guidelines range of 168 – 210 months' imprisonment. The Probation Office's Pre-Sentence Investigative Report's ("PSR") Guidelines calculation mirrors the calculation of the parties in the plea agreement. We do not object to the advisory Guidelines calculations in the plea agreement or PSR, however, as noted in the PSR, absent the Stipulated Conduct (for which his S.D.N.Y. sentence was enhanced), Mr. Mojica's offense level for assaulting a federal officer would have only been 15, not 34. PSR at Paragraph 23. After subtracting 3 points for acceptance of responsibility, and assuming a Criminal History category of II, Mr. Mojica's advisory Guidelines range would have been 12-18 months' imprisonment. Additionally, the PSR noted that:

> On June 28, 2023, the Honorable Alvin K. Hellerstein, United States Judge for the Southern District of New York, sentenced the defendant in connection with the S.D.N.Y. Indictment to 70 months of imprisonment followed by three years of supervised release. The sentence imposed in that matter was above the advisory guideline imprisonment range of 51 months to 63 months, and according to the

      sentencing transcript, the defendant's conduct while in custody was considered as an aggravating factor at sentencing.

PSR at Paragraph 7. For all the reasons stated below, we respectfully submit that the Court should sentence Mr. Mojica within the Guidelines for the offense to which he has pled guilty absent the Stipulated Conduct, as that conduct was already considered and incorporated into his Southern District sentence.

**II.     Mr. Mojica's unduly Harsh and Sub-Standard Conditions While Being Detained at the Metropolitan Detention Center and USP Canaan Warrant a Downward Variance**

Mr. Mojica was initially arrested on the S.D.N.Y. Matter on February 22, 2022, and was housed at the Metropolitan Detention Center ("MDC") at least through October 2024. This is despite being sentenced on June 28, 2023 in that case. This means that the Bureau of Prisons ("BOP") continued to house Mr. Mojica at the MDC, one of the worst pre-trial facilities in the country, for over a year after he was sentenced. After his one punch assault on an MDC correctional officer, Mr. Mojica was transferred to a maximum-security facility, the United States Penitentiary at Canaan ("USP Canaan"). After his arrest in this case, Mr. Mojica was transferred back from USP Canaan, where he was serving his sentence in the S.D.N.Y. Matter, to the MDC where he was housed in its Special Housing Unit ("SHU"), or punitive segregation and solitary confinement unit. On April 17, 2025, at the defense request, the Court requested that Mr. Mojica be transferred back to USP Canaan until his sentencing. While the BOP initially honored the Court's request, they moved Mr. Mojica back to the MDC this past July, where he has continued to be held in the SHU.

It is a matter of public record that conditions at the MDC are deplorable. The MDC continues to be frequently in the news and the subject of federal legal opinions regarding its abhorrent record for maintaining a safe and humane facility in which inmates can be detained prior to trial. Those conditions under which Mr. Mojica has been held should be considered by the Court and significantly reduce its intended sentence as a result. As part of its § 3553(a) analysis, and like many other courts have done, this Court should reduce Mr. Mojica's sentence for having been incarcerated at the MDC and, in particular, his lengthy time being housed in its SHU.

Substandard pre-sentence housing conditions are certainly relevant to a defendant's sentencing. For example, pre-pandemic, judges in this Circuit have considered the substandard conditions in the 11-South Unit of MCC and adjusted sentences accordingly. *See United States v. Behr*, No. S1 03 Cr. 1115 (RWS), 2006 WL 1586563 *5 (S.D.N.Y. Jun. 9, 2006) (imposing time-served sentence where defendant housed in MCC's 11-South Housing Unit). Harsh pre-sentencing conditions constitute collateral punishment that warrants a sentencing variance because "the punitive aspects of the defendant's confinement are increased and the deterrent effect of the defendant's confinement is also increased." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009); *see also United States v. Francis*, 129 F. Supp. 2d 612, 616-19 (S.D.N.Y. 2001) (downwardly departing because defendant spent more than thirteen months in substandard conditions including, overcrowding and inadequate hygiene).

3

Numerous courts in this District have varied downward as a result of the onerous pre-sentence detention conditions during COVID-19.  *See, e.g., United States v. Battle*, 20 Cr. 349 (EK) (E.D.N.Y.) (harsh conditions tantamount to unearned disciplinary segregation or worse); *United States v. Carpenter*, 18 Cr. 362 (GRB) (E.D.N.Y.) ("I am going to find that the Guidelines have not and at this point in history cannot have considered the effects of COVID and the other problems at MDC on the quality of incarceration."); *United States v. Latney*, 18 Cr. 606 (JS)(E.D.N.Y.) (custody during COVID abnormally harsh.  However, the conditions post-pandemic have not improved to any great extent.  Judge Furman of the United States District Court for the Southern District of New York, detailed the many disturbing conditions at the MDC.  *See United States v. Chavez*, No. 22 Cr. 303 (JMF), 2024 U.S. Dist. LEXIS 1525, (S.D.N.Y. Jan. 4, 2024).  In an often-quoted passage, Judge Furman wrote, citing a myriad of cases:

> the dockets of this Court and the Eastern District have been filled with cases in which defendants complain about near perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care.  Contraband – from drugs to cell phones – is widespread.  At least four inmates have died by suicide in the past three years.  It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC.  Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable.

*Id.*  In his decision, Judge Furman detailed the dreadful conditions and focused on three in particular: (1) the inordinate amount of time inmates spend in "lockdown – that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise (in Orwellian fashion the Bureau of Prisons does not refer to these periods as 'lockdowns'; instead it refers to them as 'modified operations'"); (2) the MDC's notoriously slow and sometimes "egregiously slow" medical care and mental health treatment; and (3) the MDC's deplorable physical conditions that include "mold on the walls and ceilings, contaminated drinking water, vermin infestations, mouse droppings falling through HVAC vents, and roaches and flies in the showers." *Id.* at 11-16.  Those conditions continue to date.

Mr. Mojica was housed at the MDC for more than three years under extremely harsh conditions.  The conditions in which he has had to live were and are unduly harsh, sub-standard, and punitive.  The Court should conclude that based on his conditions of confinement at the MDC, a substantial downward variance is warranted.

**III.    Mr. Mojica's History and Characteristics, Desperate Need for Mental Health Treatment, and That He Has Already Been Punished for the Stipulated Conduct Establish that the Court Should Sentence Mr. Mojica One Year Imprisonment**

As Judge Hellerstein stated when sentencing Mr. Mojica, he "has had a really tough life".  *United States v. Mojica,* 21 Cr. 377 (AKH) (S.D.N.Y.) at ECF No. 156 at 10.  Born in the Dominican Republic to a teenage mother, Mr. Mojica was raised primarily by his uncle.  From a young age Mr. Mojica exhibited anxiety and other mental health issues, but was not given any treatment.  When he was thirteen his mother moved him and his sister to the United States where

4

again he was not given treatment. This trend of moving around, sometimes living with his mother and sometimes not, and not receiving mental health treatment would continue up until his arrest in the S.D.N.Y. Matter. His incarceration at the MDC, where he has had little to no mental health treatment, access to the legal library or any recreation, and is instead secluded from other inmates all day, has compounded his mental health crisis. Mr. Mojica requires comprehensive mental health care and treatment, not a lengthy term of imprisonment. These factors, and the fact that Judge Hellerstein already considered the inmate assault when Mr. Mojica was sentenced in the Southern District of New York, militate for a sentence of one-year' imprisonment.

   a. *Mr. Mojica's History and Characteristics, Including His Untreated Mental Illness*

Mr. Mojica was born in the Dominican Republic and raised primarily by his uncle, Ivan Mojica. Mr. Mojica's mother was a teenager when he was born, and was already raising his older sister Emmy. Mr. Mojica's parents divorced when he was two years old, and his father was not active in his life when he was young. Ivan Mojica stepped in to help raise his nephew, but he could not replace Mr. Mojica's biological father. Mr. Mojica's father was in the military in the Dominican Republic and would only come around when Mr. Mojica was misbehaving. In fact, Mr. Mojica would purposefully act out at school partially with the hope that his father would have to come pick him up. This was both rebellion on Mr. Mojica's part, as well as a cry to actually have his father in his life.

Another reason he acted out was because of the anxiety from being away from his family. His mother reports that he had "anxiety and an emotional disturbance during his early childhood years in the DR." Report of Dr. Eric Goldsmith annexed hereto as Exhibit "A" at 2.[1] When he was five years old Mr. Mojica was "diagnosed with Encopresis with an understanding that the problem stemmed from anxiety and other psychological issues. Nevertheless, Mr. Mojica did not receive mental health treatment in the DR." *Id.* What he did get was significant separation anxiety whenever he had to leave home to go to school.

When he was thirteen Mr. Mojica, his mother, his sister, and his uncle relocated to the United States. Mr. Mojica's sister writes, "[u]nfortunately, coming to the United States was a difficult transition for him. While we hoped for a better future, he struggled to adjust emotionally, and he carried challenges from his teenage years that were never fully addressed." Letters in Support from Family and Friends annexed hereto as Exhibit "B", Letter from Anna E. Mojica. After only eight months Mr. Mojica and his uncle relocated to North Carolina, separating him from his mother and sister. He "had a difficult time coping with being separated from his biological father and the disruptions in his parenting". Exhibit "A" at 3. His mother writes [t]his separation was extremely hard on him because we have always been deeply connected. I truly believe that some of the emotional scars from that time influenced certain decisions he made later in life." Exhibit B, Letter from Rosa Emilia Bido.

To cope with this "anxiety, depression, and emotional distress" Mr. Mojica began using marijuana heavily. Exhibit "A" at 3. In lieu of professional treatment, he self-medicated, starting around age fourteen. The lack of stability, one of the driving factors for his anxiety,

---

[1] Because this report contains Mr. Mojica's confidential medical information, we will be submitting Exhibit "A" *via* EMail under seal.

5

continued with his "family's constant relocation in search of better opportunities." PSR at Paragraph 62. Given his childhood, mental health struggles, and drug dependence, it is not surprising that Mr. Mojica associated himself with the wrong crowd and dropped out of high school. It is also not surprising, given the same factors, that Mr. Mojica was arrested in the S.D.N.Y. Matter. Since his arrest, his already fragile mental health has decreased significantly. Since returning to the MDC he spends all of his time isolated in SHU. He is not afforded any recreation or socialization, and his family has reported an overall deterioration in his condition. Mr. Mojica has gone from the MDC's SHU, to USP, Canaan's general population unit, back to the MDC's SHU. None of these placements have contributed positively to Mr. Mojica's mental health, and have all aided in the deterioration of his mental health.

In anticipation of sentencing, the Court authorized Dr. Eric Goldsmith to conduct a comprehensive psychiatric assessment of Mr. Mojica. After completing his evaluation, Dr. Goldsmith concluded that Mr. Mojica "evidences a history of childhood onset anxiety and emotional disturbance" and his "behavior is consistent with a first break psychotic illness." Exhibit "A" at 1. Dr. Goldsmith stated that at his age, Mr. Mojica is "the model age for the onset of schizophrenic conditions." *Id.* at 4.

The National Alliance on Mental Illness ("NAMI") describes first break psychosis, also referred to as early or first-episode psychosis, as "when a person first shows signs of beginning to lose contact with reality. https://www.nami.org/about-mental-illness/mental-health-conditions/psychosis/. NAMI also states that hearing, seeing, tasting or believing things that others do not, persistent, unusual thoughts or beliefs that can't be set aside regardless of what others believe, strong and inappropriate emotions or no emotions at all, withdrawing from family or friends, a sudden decline in self-care, or trouble thinking clearly or concentrating "strongly indicate an episode of psychosis. *Id.*

Mr. Mojica has exhibited most if not all of these signs. When talking to Mr. Mojica he often makes comments totally unrelated to the topic at hand. He went from being well dressed and well kept (*See* Exhibit "B", Letter from Juan Holguin) to someone that "appears disheveled. His hair is unkempt." Exhibit "A" at 3. Most unusually, before we were appointed to represent Mr. Mojica, he stopped contacting his family, with whom he was always extremely close. Other inmates had to reach out to them to keep them apprised on how he was fairing. Thankfully he has regained contact with his family, who are immensely supportive of him.

If it is established that he "does in fact have a first-break psychotic illness, he requires an appropriate neuropsychological workup and then comprehensive psychiatric treatment including programming, counseling, and treatment with mood stabilizing antipsychotic medication." Exhibit "A" at 5. Furthermore, "[f]urther use of cannabis or other psychoactive substances would place him at high risk for future psychotic symptoms." *Id.*

Incarceration, especially at the MDC where Mr. Mojica is currently housed, is the antithesis of the treatment that he needs. The Court should not sentence Mr. Mojica to a lengthy term of imprisonment, and instead should let him get the help he needs while on supervised release. "District courts are permitted . . . to 'hedge against a relatively lenient term of imprisonment' by imposing a longer term of supervised release." *United States v. Leon*, 663 F.3d 552, 556 (2d Cir.

6

2011) (imposing sentence of time served and 59-month period of supervised release); *see also United States v. Reese*, 568 F. App'x 74, 75 (2d Cir. 2014) (quoting same and affirming sentence of nine months' imprisonment and life term of supervised release); *United States v. E.L.*, 188 F. Supp. 3d 152, 176 (E.D.N.Y. 2016) (collecting cases in which, in view of the "comparatively lower culpability" of particular class of defendants, "courts have increasingly imposed sentences with minimal or no incarceration" followed by long periods of supervised release). Indeed, one court in the Southern District has found that where a defendant has special needs for extended mental health treatment, a shorter term of incarceration combined with a lengthy period of supervised release best serves the long-term goals of punishment. *United States v. Melendez*, No. 04 Cr. 424 (RWS), 2005 WL 1423268, at *8 (S.D.N.Y. June 15, 2005) (considering a defendant's "life-long mental health challenges" when imposing a below-Guidelines sentence).[2] For these reasons, Mr. Mojica's history and characteristics favor a sentence of no more than 12 months' imprisonment.

> b. *The Stipulated Conduct was Already Considered by Judge Hellerstein in the S.D.N.Y. Matter*

As noted above, Mr. Mojica stipulated to his involvement in the inmate assault, and he does not object to the advisory Guidelines calculation in both the plea agreement and PSR. However, as the PSR states:

> On June 28, 2023, the Honorable Alvin K. Hellerstein, United States Judge for the Southern District of New York, sentenced the defendant in connection with the S.D.N.Y. Indictment to 70 months of imprisonment followed by three years of supervised release. The sentence imposed in that matter was above the advisory guideline imprisonment range of 51 months to 63 months, and according to the sentencing transcript, the defendant's conduct while in custody was considered as an aggravating factor at sentencing.

PSR at Paragraph 7. The Stipulated Conduct was thoroughly disclosed in the governments sentencing submission and supplemental sentencing submission. *See United States v. Mojica,* 21 Cr. 377 (AKH) (S.D.N.Y.) at ECF Nos. 144 and 151. The sentence handed down by Judge Hellerstein was nineteen months higher than the low end of the guidelines, and it is unknown what sentence he would have given Mr. Mojica, a defendant with no criminal history points, absent the stabbing. Mr. Mojica has already been punished for the Stipulated Conduct, and the Court should instead determine the correct sentence for assaulting a corrections officer. Twelve months' imprisonment would represent a Guidelines sentence after factoring out the Stipulated Conduct and represent a sentence sufficient but not greater than necessary to rehabilitate and deter Mr. Mojica from further criminal conduct. Mr. Mojica is in desperate need of mental health treatment.

---

[2] As Mr. Mojica is already serving a 70-month sentence on the S.D.N.Y. Matter, and his drug abuse has been documented in both the PSR and Dr. Goldsmith's report, we also ask that the Court recommend that he be placed in a facility that administers the Residential Drug Abuse Program ("RDAP"), irrespective of the sentence given in this matter.

**IV.     Conclusion**

Mr. Mojica's life has been unusually difficult, struggling with moving from home to home without any stability.  Additionally, he has suffered from untreated mental health disease since he was very young in the Dominican Republic.  His condition deteriorated with heavy marijuana use, and the conditions of his incarceration at the MDC have likely led to a first-break psychotic illness.  He needs to be treated by mental health professionals and supervised by the Probation Office, not continue to deteriorate in prison.  For the foregoing reasons, we respectfully request that the Court sentence Mr. Mojica to twelve months' imprisonment.

Respectfully submitted,

/s/

Shannon McManus
César de Castro


cc:     David Berman
        Assistant United States Attorney (*via* ECF)